RODNEY F. DYER *et al. vs.* CRANSTON PRINT WORKS COMPANY.

PROVIDENCE—MARCH 20, 1901.

PRESENT: Stiness, C. J., Tillinghast and Douglas, JJ.

(1) *Waters. Dams. Mortgages. Easements. Accretion.*

A., the owner of one-half of the dam and of the water-rights appurtenant thereto, on the west side of a stream and pond, conveyed the property to G., who thereupon gave a mortgage of the property to A. and then conveyed it, subject to the mortgage, to S., the owner of the other one-half of the dam and of the water-rights on the east side of the river. S. assigned the entire property to C., and by foreclosure the western portion passed again to A. While C. was the owner of the whole estate he raised the dam and used the entire water-power :—

*Held,* that the raising of the dam had not modified the appurtenant water-rights of the mortgaged property. The improvements made upon the mortgaged property by C. became a part of the freehold, and when the property was sold under the power contained in the mortgage it carried with it all accretions voluntarily made by the mortgagor.

*Held,* further, that the use made of the water in connection with the land on the east side of the river could not establish any easement in favor

of that portion of the estate as dominant to that portion covered by the mortgage. A servitude created upon land already subject to a mortgage is cut off by a subsequent foreclosure.

(2) *Waters and Water-Courses. Reservoirs.*

Where reservoirs constructed by a riparian proprietor upon a stream or its tributaries use only the water which would naturally pursue the same course to the sea, the proprietor gains no advantage; but all proprietors are entitled to share the benefit of their use, whether they contribute to their construction and maintenance or not.

(3) *Waters. Injunctions. Equity.*

*Semble,* where a complainant (entitled to the use of one-half of the water of a stream) has no appliances for using the water for any purpose, but expresses a desire to make use of his share of the water without having taken any steps toward doing so, while the defendant is operating a print-works using and needing large quantities of water (no ground of claim of prescriptive right in the defendant appearing beyond his share), equity will refuse an injunction limiting the defendant to the use of one-half the water—as useless and oppressive—until such time as the complainant is ready to make use of the water.

Riparian owners are tenants in common of the use of the water. Neither owns the water itself, and unless he has a use for it cannot exercise his right. If both have use for it, it must be equally divided; but if only one can use it, his use of the whole works no harm to his co-tenant.

BILL IN EQUITY to ascertain and apportion water-rights in certain water-property. For previous decisions and a history of the case see 17 R. I. 774, 18 R. I. 526, 19 R. I. 208, 19 R. I. 211, 20 R. I. 143, 21 R. I. 63. Heard on exceptions to report of master, and exceptions overruled.

DOUGLAS, J. This case is now before the court upon exceptions to the report of the master appointed by decree filed March 31, 1899.

The master found:

First. That the surviving complainants have acquired, since the death of Rodney F. Dyer, all his rights in the premises in controversy.

Secondly. That in 1880 Zachariah Chafee, trustee, erected a new dam, as stated in the bill.

Thirdly. That since June 1, 1872, the A. & W. Sprague Mfg. Co. and its successors in title to the Cranston Print Works estate have filled out from the easterly bank of the river below the print-works dam, and have crowded the

waters of the river to the westward, upon the lands of the complainants, so as to carry the centre-line of the river below the dam to the westward of the centre-line as it existed in 1872, and have extended the easterly bank of the river for a certain distance below the dam to the westward and beyond the centre-line of the river as it existed in 1872, as stated in the bill.

Fourthly. That the centre-line of the Cranston Print Works pond and of the Pocasset river, below the Cranston Print Works dam, as that line existed June 1, 1872, is as delineated on the plat returned with the report.

Fifthly. That the complainants and the respondent are entitled to use equal proportions of the water flowing from the Pocasset river through the Cranston Print Works pond to the dam.

Sixthly. That while the centre-line of the dam and the pond at the dam as they are now, is four feet easterly of the centre-line of the dam and pond as they existed June 1, 1872, this change does not practically or appreciably affect the quantity of water they are respectively entitled to use.

Seventhly. That while the trench of the respondent at the easterly end of the dam as now constructed is of sufficient capacity to take the entire average flow of the river, never·theless, the trench and its appurtenances are so constructed that the flow of water through the trench may be limited to the quantity which the respondent is entitled to draw, and, therefore, that no change in said trench, gates, and appurtenances should be made.

Eighthly. That the relative capacities, levels, apertures, position, methods of construction and of operating the respective trenches, gates, &c., of the complainants and of the respondent should be the same, and that, therefore, the complainants are entitled to construct and maintain a similar trench on their land adjacent to the pond.

The first four exceptions are to the master's finding on questions of fact, and are not insisted upon. The evidence submitted supports the master's findings, and they must be confirmed.

The exceptions relied upon are the fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, and fourteenth, and these raise, in substance, two questions:

1st. Has the master rightly found that the complainants and the respondent are entitled to use equally the water-power and rights of the Pocasset river at the dam which retains the print-works pond ?

2nd. If so, are the complainants entitled to restrain the defendant from using more than one-half of the average flow of the water in the river at the present time ?

The defendant's argument in support of his objections to the finding of the master upon the first question is that the master should have found that in April and June, 1872, the dam belonged to the A. & W. Sprague Mfg. Co., and that it was then entitled to maintain it, and hence had a right to all the water-power created by the dam except what had been reserved by the agreement of 1736 between Samuel Dyer and Rowland Sprague ; that this right was not lost by the conveyances of 1872 and the foreclosure of the mortgage in 1883, nor by the alteration of the dam by Chafee.

Secondly. That the master should have found the defendant entitled, in addition to its right to use the natural flow of the stream, to the exclusive right to use the increased flow of water at certain seasons caused by the maintenance of certain reservoirs.

There can be no question that the deed of Dyer to Gallup, of Gallup to the A. & W. Sprague Mfg. Co., and the mortgage from Gallup to Dyer, all made in 1872, conveyed the land westerly of the centre-line of the Pocasset river below, at, and above the dam ; and in neither of these conveyances is there any exception of that part of the dam itself which was west of the centre-line, and which was as much a part of the realty as the houses and fences and other "improvements" mentioned in the deeds. The parties to these conveyances have left no room for construction in defining the exact boundaries of the land they were dealing with. If there had been contentions theretofore as to the ownership of the dam, as the evidence shows, these conveyances settled

them, as between the parties and their successors in title, forever.

But this question was not before the master, as it had already been repeatedly decided by the court. In the opinion on the defendant's demurrer, 17 R. I. 777, the court say: "The complainants' title rests upon deeds bounding upon the centre-line of the river and pond. By that line he sold, including the water-rights; and from that line including the same water-rights, he received back the deed of mortgage subject to which the deeds in the respondent's chain of title were given. . . . The mortgage was good for the water-rights therein described, and Chafee took his title subject to said mortgage."

Again, the respondent argued that he should be admitted to show by evidence to a jury, upon issues framed, what the water-rights were which were passed under these conveyances; but the court, after full argument, held that the expression in the deed as it had been formerly construed was not ambiguous and included the rights to use the power of the water as raised by the dam, as well as the riparian rights appurtenant to the land, and refused to send the issue to a jury. Rescript of July 7, 1893, 19 R. I. 211.

The respondent then filed a bill to reform the deed and mortgage, and the court again affirmed the rescript of 1893, and decided that the deeds expressed the intention of the parties. 19 R. I. 208. A final decree dismissing the bill was entered January 27, 1896.

The defendant again, February 5, 1896, moved for additional issues, involving claims of right to the water antedating the conveyance of 1872, and these issues were refused. Another motion for additional issues, made February 27, 1896, was disallowed.

The death of the original complainant made an amendment of the bill necessary, stating how his title had devolved; and the defendant seized the opportunity to present amendments to the answer, setting up prescriptive rights and claims to the water-power similar to those he now urges. Excep-

tions to these amendments were sustained, after exhaustive argument.    Opinion, June 15, 1897, 20 R. I. 143.

A further motion to amend the answer was made March 30, 1897, which was refused November 17, 1898, 21 R. I. 63.

A decree was entered embracing all these decisions December 14, 1898, sustaining the exceptions to the amended answer and finally settling the issues of fact in the case.

These repeated decisions of the court conclusively determined as between the parties to this cause that their respective rights to use the water of the Pocasset river at the print-works dam, either as riparian owners or for purposes of motive power, were defined by the conveyances of 1872, and restricted the inquiry in this case to any changes or modification of those rights which might have taken place since those conveyances.

The decree referring the cause to the master, entered March 31, 1899, directed him to report upon the issues of fact as settled by the decree of December 14, 1898, and, in addition, to ascertain and delineate upon a plat the centre-line of the pond at the dam and the centre-line of the river below the dam as they existed June 1, 1872, with reference to the present pond, dam, and river; to report the proportions in which the parties are entitled to use the water of the river; and, having determined these rights, to suggest, in substance, proper appliances to secure them and prevent infringement upon them by either party.  The right to object to any testimony to be taken by the master was expressly reserved.

It was the duty of the master, in determining the water-rights of the parties, to take the facts as he found them and the law as already determined by the court, and this he has done.    The court's construction of the deeds of 1872 decided that the plaintiffs in 1872 were the owners of one-half the dam and of the water-rights appurtenant thereto.    The master, having found that the subsequent alterations of the dam had not so changed the middle line of the pond as to affect appreciably the water-rights of the parties, could not do otherwise than report that the parties are each now entitled to the use of one-half of the water.

(1)    Aside from the fact that the court has so many times decided the question of right to the water, a careful review of all the evidence fails to show any error in the conclusion that the middle line of the river and dam, as they existed in 1872, is the only certain boundary between the estate of the complainants and the defendant.    The agreement between Samuel Dyer and Rowland Sprague, November 8, 1736, was a license to erect a dam five feet high for the purpose of furnishing power to run a grist mill on the east side of the river, and reserving the right to draw so much water as should be necessary to carry a blacksmith's hammer and a pair of bellows on the west side.    Whatever right the ancestors in title of the defendant were given by this conveyance they seem to have abandoned before the memory of anyone now living.    In 1855, when C. O. Bennett repaired the dam then in existence, he found and removed the remains of an old saw-mill which had succeeded the grist-mill, and which had itself become obsolete when the print-works were established.    Within the recollection of Amasa Sprague, four dams in succession have been in use previous to the present one. No ascertainable right in the water-power can, therefore, be founded upon the license in question.    It may be fairly inferred, however, as suggested by complainants' counsel, that if this dam was approximately situated at the site of the present one, the parties then owning the riparian rights intended that the water-power then created should be shared between them according to their several necessities.

The deed of Samuel Dyer to Rowland Sprague, of February 21–25, 1739–40, also fails as proof of any definite right in the defendant to the land westerly of the centre-line of the river and pond.    No attempt to locate the land described has been reasonably successful.    The most that can be granted is a probability that this land lay near the 1872 dam and bounded westerly upon the shore of the pond and easterly upon the channel, and a possibility that the A. & W. Sprague Mfg. Co. were the successors in title to this lot from Rowland Sprague.    Neither is there any satisfactory proof in the case of a prescriptive title in the Spragues to the exclusive use of

the water.   The evidence is at least as consistent with the be-
lief that their use was permitted as that it was adverse.   For
many years previous to 1872 there is no evidence that they
used the water for power at all, or that, either then or since,
their use of the water for print-works purposes continuously
exceeded the one-half of the average flow to which they were
entitled.

The court then, if it had found it necessary to decide the
question of title in the suit to reform the deeds of 1872,
would have been forced to the conclusion that, so far as the
evidence showed, the parties in 1872 were owners in fee each
to the middle line of the river and pond, and that the water-
right naturally appurtenant to the dam had not been severed
from the realty by any conveyances or by operation of law.
What it did decide in that suit was that the parties intended
by these conveyances to settle all differences and claims by
recognizing the claim of Dyer to the land on the westward of
the middle line, with all its appurtenant water-rights.   The
opinion says, 19 R. I. p. 213 :  "However the Spragues may
have regarded such a claim of right, and however the fact of
the existence of the right may have been, it seems to be clear
that the agreement and conveyances were intended to cover
them."

Taking the respective titles as they are recognized to have
existed by the conveyances of 1872, the question was prop-
erly before the master whether any changes had occurred
since that time which had so affected the mortgaged property
as to modify its appurtenant water-rights.   Evidently the
raising of the dam could not do this.   Chafee, when he made
the alteration, was the owner of the whole estate.   Part of
it was described in the mortgage, subject to which he had
taken his title, and which he had recognized as a valid in-
cumbrance.   Whatever improvement he made upon the mort-
gaged property became a part of the freehold and increased
the value of the security.   When the property mortgaged was
sold under the power contained in the mortgage, it necessa-
rily carried with it all the accretions voluntarily made by the
mortgagor.   While the law will restrain a mortgagor from

wasting the security of his creditor, it will not interfere with his improvement of it.    Neither could the use which was made of the water after 1872, in connection with the land on the east side of the river, establish any easement in favor of that portion of the estate as dominant to the portion covered by the mortgage.    A servitude created upon land already subject to a mortgage is cut off by a subsequent foreclosure of the mortgage.    The purchaser under the foreclosure sale acquires the title as it stood at the time of making the mortgage, free of all intervening rights.    Jones on Easements, § 851S.    Citing *Leavenworth Lodge* v. *Byers*, 54 Kan. 323.

(2)    The second objection to the fifth finding of the master is that he has not allowed to the defendant the exclusive use of the additional flow of water in certain seasons, caused by reaervoirs which it has maintained upon the stream.    The same answer may be made to this objection as to the former : That none of these reservoirs has been constructed since 1872.    The water-rights at the dam then were the same as now, so far as the quantity annually flowing in the river is concerned.    But if this were not so, we cannot agree to the claim that one who regulates the natural flow of a river by retaining the water in time of freshets and storing it for use in time of drought thereby gains any exclusive right to use it as against another riparian owner.    In the cases cited by the defendant the claimants actually added to the natural stream water which they afterwards were allowed to take away from it.    In *Society, &c.*, v. *Morris Canal Co.*, 1 Sax. Ch. 157, it was urged that the defendant brought into the Passaic river from Lake Hopatcong as much water as it drew from it into its canal. This, among other reasons, was considered by the court in denying an injunction.    In *Elliot* v. *Fitchburg Railroad Co.*, 10 Cush. 191, the question decided by the court was whether a diversion of the water of a brook, not causing actual perceptible damage, would be ground for an action by a lower riparian proprietor.    The court held that it would not ; and, incidentally, that there would be no damage if the amount of water diverted was made good by digging ditches and conducting to the stream water which would not otherwise reach.

it.   In *Whittier* v. *Cocheco Mfg. Co.*, 9 N. H. 454, the par-
ties were owners of land on opposite sides of the river, and
the right to use the water had been divided between them by
conveyance and use.   The defendant added water to the river
above, from another source, and the court decided that he
might lawfully permit so much water as he had been accus-
tomed to use and the additional water supplied by him to flow
past the dam for use at a point on the river below.

"This part of the case," say the court, "depends upon
some special circumstance probably not often existing."

In *Butte Canal Co.* v. *Vaughn*, 11 Cal. 143, the defendant
procured a supply of water from a foreign source and used
the bed of the river as a conduit to bring it to his premises,
and there diverted a less quantity from the stream.   It was
held that this was no injury to the plaintiff, who had a right
to the natural flow of the stream.

The principle is clearly stated, in these cases, that a riparian
proprietor who adds to the water of a stream from a foreign
source has the right to withdraw for his own use, exclusive
of other riparian proprietors, the same quantity he has added,
provided that quantity is ascertainable by evidence.   If the
amount added is uncertain, the doctrine of mingling of goods
applies, and he loses the right to reclaim it.

As to reservoirs constructed upon the stream itself or its
tributaries, the law is well settled that all riparian proprie-
tors are entitled to share the benefit of them, whether they
contribute to their construction and maintenance or not.   If
one proprietor, for his own benefit, regulates the natural flow
of the water so as to diminish the flow when it is excessive
and to augment it when it is deficient, using, however, only
the water which would naturally pursue the same course to
the sea, he gains thereby no advantage over his neighbor,
but must permit him to share equally in the benefits of the
arrangement.   *Tourtellot* v. *Phelps*, 4 Gray, 370 ; *Pratt* v.
*Lamson*, 2 Allen, 275 ; *Clinton* v. *Myers*, 46 N. Y. 511, 520.

It appears from the evidence in this case that the reservoirs
maintained by the defendant are all within the water-shed
which is naturally drained by the Pocasset river, and hence

store and regulate the water-supply without adding to its volume from extraneous sources. The complainants are therefore entitled to one-half of the water, as its flow is affected by the reservoirs, as they would be to the natural flow if the reservoirs did not exist. For these reasons, the exceptions taken by the defendant to the fifth finding of the master must be overruled.

The other findings do not require discussion, as they are favorable to the defendant except in so far as they are based upon the fifth, and the exceptions thereto must be overruled.

(3)    The defendant's ninth exception raises the question, in substance, whether at the present time an injunction ought to be granted to restrain the defendant from the use of more than one-half of the water. This is obviously not for the master to say; it is a matter for the court to decide upon the entry of the final decree. But since the conclusions we have arrived at above leave only this question in the case, and as counsel for both parties have fully argued it in their briefs and orally, it may be considered now.

It appears that the complainants have not at present any appliances for using the water for power or for any other purpose. Their land is a farm, with no mill or manufactory of any kind upon it. According to the allegation of their bill they are desirous of making use of their share of the water and of developing their water-rights and water-privilege; but it does not appear that they have taken any steps towards doing so. The defendant, on the contrary, is operating a print-works in which very large quantities of water are needed and actually used.

It is the office of an injunction to restrain and prevent infractions of legal rights which either inflict actual damage or deprive of beneficial use or by continuance may extinguish the right itself. Now the rights involved in this case are of a peculiar nature.

The parties as riparian owners are tenants in common of the use of the water. Neither owns the water itself, and unless he has a use for it cannot exercise his right. If both have use for it, it must be equally divided; but if only one

can use it, his use of the whole works no harm to his co-tenant.

In Gould on Water, section 207, it is said : "As each proprietor has simply the usufruct of the water as it passes along, no exclusive title is acquired to one-half or to any definite part, as an article of property or merchandise, but each proprietor is entitled, *per my et per tout*, to the use of his proportion of the whole bulk and volume of the water as it flows down the channel. It follows that although an exclusive use of the water may be acquired by an actual adverse possession and enjoyment, yet the mere use by one proprietor of all the water unaccompanied by any act of exclusion against the other proprietors or by the assertion of any superior or exclusive claim is not in its nature adverse, and affords no cause of complaint."

*Warren* v. *Westbrook Mfg. Co.*, 88 Me. 58, was heard on demurrer to the bill, which sought to have defined the rights of riparian owners on opposite sides of a stream. The court says, page 65:

"Where one party owns the land on one side of the river, and another party owns land on the opposite side (their lands coming together under the river midway between the two banks), and each owns the half of the dam on his land, then neither party is entitled to have the whole power of the accumulated water applied to his machinery. Each party has only an equal right with the other. Each has a right to use one-half that power ; but whatever part of that half he does not use, the other party can freely use. There is no proprietorship in the water, but only a right in its use, and one riparian owner may use so much as the other is willing to let go to waste." Citing *Pratt* v. *Lamson*, 2 Allen, 275. In the latter case the court say, page 288 : "Such being their relation to each other" (referring to opposite riparian owners), "it is obvious that the mere use by one of them of all the water unaccompanied by any act of exclusion against the other or by the assertion of any superior or exclusive claim, is not in its nature adverse, does no injury, and affords no cause of complaint or action. . . . But where a proprie-

tor of land upon one shore appropriates and applies to his individual use so much of the passing water as he is enabled to do, even if it be the whole of it, by means of structures erected upon and within the limits of his own estate, and the proprietor of the land on the opposite shore neither uses nor seeks to use, nor makes any provision, nor has any occasion for the use of any part of the stream or proportion of water to which he is entitled, there is nothing adverse in the action of the former."

The dam referred to in this case was wholly built upon the defendant's side of the river, but the statement of right to use the water is of general application. It amounts to this, that either tenant in common of the water may use all the water coming down the stream which the opposite proprietor does not appropriate, provided he does it by such means and in such a manner that an exclusive claim of right will not be inferred from such use.

In the case at bar, as we have seen above, the defendant and its predecessors have freely used the water of the river as they saw fit for many years, and the complainants and their predecessors have made no use of it whatever for power, and very little, if any, for other purposes, yet we have found no ground of claim of prescriptive right in the defendant in the circumstances of this case. The granting of an injunction limiting the defendant presently to the use of one-half of the water of the river and permitting the complainants wantonly to open such a passage as would run to waste one-half of the stream would be, it seems to us, an unwarranted exercise of the discretion of the court—both useless and oppressive.

The complainants are entitled to a decree declaring that they are possessed of the right to use, for all hydraulic purposes, one-half of the waters of the Pocasset river as they flow down to and are retained by the Cranston Print Works dam, and to such further assistance of this court, by injunction or otherwise, as may be required to enforce this right when they are ready to make use of it. See *Franklin* v. *Pollard Mill Co.*, 88 Ala. 318. Such decree should also im-

pose upon the complainants the obligation of maintaining their half of the dam from and after the time when they begin their use of the water for mechanical purposes. *Matteson* v. *Wilbur*, 11 R. I. 545.

C. *Frank Parkhurst*, for complainants.
*Edwards & Angell*, for respondent.